[Civ. No. 3256.   Fourth Dist.   Oct. 9, 1944.]

MARIA M. DE PONCE, Respondent, v. SYSTEM FREIGHT SERVICE (a Corporation), Appellant.

SYSTEM FREIGHT SERVICE (a Corporation), Appellant, v. CIPRIANO M. RODRIGUEZ, Respondent.

Reginald I. Bauder, Richard North and Tripp, Callaway & Sampson for Appellant.

Chase, Barnes & Chase, M. Richard Imes and Parker & Stanbury for Respondents.

MARKS, J.—This is an appeal from a judgment in favor of Maria M. De Ponce for damages resulting from the death of her son, Rudolph M. Suarez, and a judgment in favor of Cipriano M. Rodriguez for damages to his truck and its load. The cases were consolidated for trial and on appeal. Appellant presents but one ground for a reversal of

the judgment: refusal to give an instruction requested by it, which, after quoting subdivision "a" of section 525 of the Vehicle Code, continued as follows:

"Should you find from all the evidence in this case that Rudolph Suarez at the time or immediately prior to the happening of this accident, drove or operated the Chevrolet truck in such a manner as to constitute a violation of the foregoing provision of law, then such conduct on his part would constitute negligence as a matter of law and should you further find from all the evidence that such negligence, if any, on the part of Rudolph Suarez was the proximate cause of the accident and that Thomas Merrill was free from contributory negligence, then and in that event, your verdict must be in favor of plaintiffs, Flavia Virginia Merrill and System Freight Service and against the defendant Cipriano M. Rodriguez."

It should be noted that an instruction on the same subject but not in the same form was given at the request of respondents. To determine the soundness of the argument of appellant we must outline the circumstances of the collision which resulted in this litigation as the correctness of an instruction frequently depends on the facts developed at the trial.

The accident happened near Garnet on the highway between Banning and Indio. The road runs easterly and westerly and has a twenty foot paved portion in its center with five foot oiled shoulders on each side. It descends a grade easterly from Whitewater, which grade flattens out somewhat near Garnet. There are curves east of Whitewater, then the road is straight for about two or three miles to a point about half a mile east of Garnet. There are various dips in the road but the evidence does not show any of them descending more than three feet below the general grade.

Two trucks were involved in the accident which happened about midnight of June 16, 1940. Respondent Cipriano M. Rodriguez owned a Chevrolet truck which was being driven westerly on the highway at a speed of between 35 and 45 miles per hour by Rudolph Suarez, his employee. This truck with its load of vegetables weighed 6½ tons. Appellant was the owner of an Auto Car Diesel Truck (referred to as a tractor) and a semi-trailer. Both, with the load weighed 29 tons. This vehicle was being driven easterly on the highway at a speed of between 60 and 65 miles per hour by Thomas Merrill, an employee of appellant. The two vehicles came to-

gether about 300 feet west of Garnet. The Chevrolet truck and the tractor drawing the semi-trailer were practically demolished. The two drivers, and Jesus Samorra who was riding in the Chevrolet, were killed.

There was only one eyewitness who was able to give the complete story of the accident. Warren Henry Tucker was driving easterly on the highway. He saw the System truck pull out onto the highway at Whitewater about four miles west of the point of the collision, and followed it. He testified that Merrill drove the vehicle at about 35 miles an hour through the curves east of Whitewater. After reaching the straight highway its speed was increased to between 60 and 65 miles per hour and was 60 miles per hour at the time of the collision. He testified that while he was following appellant's vehicle at about its same speed, he looked at his speedometer once and it was then registering 63 miles per hour.

He also testified that he observed appellant's vehicle continually from Whitewater easterly to the point of the collision and followed it at a distance of between 100 and 200 feet; that it swerved from one side of the road to the other and went to the north of the center line (its left hand side) five or six times. He described the accident as follows:

"Q. Had it (System vehicle) varied its speed, as far as you could observe, from the time you saw it when it was a mile and a half from the accident, up until the time of the accident? A. No. Q. Mr. Tucker, did you observe the vehicle with which this System truck collided, before the accident? A. I just seen its lights. Q. Did you observe, prior to the impact, on which side of the highway these lights were? A. On the north side of the highway. (Its proper side) . . . Q. (Mr. Welker) Mr. Tucker, you describe, just before the System got to Garnet, just what you observed. A. He (driver for appellant) went across the line, on the north side of the highway. Q. All right; what did he do then? A. He must have hit a little bump or something. ' MR. WELKER: Wait a minute; I should skip that. A. He came back on his own side, and then he went across again, and he hit this truck or car, whatever was coming up. It was a truck coming up. Q. At the time that he hit this truck coming up, as you have described, on which side of the highway was that truck? A. That truck was on the north side of the highway."

Two members of the California Highway Patrol reached

the scene of the accident shortly after it happened. In their testimony they plotted the course taken by appellant's vehicle, as shown by its tire marks, on a map which is before us. These tire marks commenced about 146 feet west of where the rear of the semi-trailer came to rest. They ran in the south lane for about 100 feet and then curved to the driver's left for about 46 feet to the rear of the semi-trailer which came to rest headed northeasterly completely blocking the north traffic lane, the north shoulder, and the northerly portion of the south lane. The tractor drawing the semi-trailer, blocked the north shoulder and part of it was on the desert sand north of the roadway with its right front jammed into the Chevrolet truck so tightly that the two vehicles had to be pried apart. The Chevrolet came to rest headed northeast with its right rear about on the center line of the pavement. It completely blocked the north lane, the oiled shoulder and projected onto the desert. What is referred to as a "blinker sign" was fourteen feet north of the pavement. Its post was broken off by one of the vehicles. The engine of the Chevrolet was thrown out of the vehicle and was lying to its east, either on the north edge of the concrete pavement or on the oiled shoulder. The body of Jesus Samorra was found lying on the sand in front of the Chevrolet.

It is the theory of appellant that before the accident, the Chevrolet was traveling in the south (its wrong) traffic lane; that the collision occurred in that lane; that the force of the impact threw the vehicles into the positions in which they were found. From this it is argued that it was prejudicial error to refuse the requested instruction as the jury was not instructed on the law upon which the sole theory of defense of the appellant rested.

This argument rests on the testimony of two witnesses—Highway Patrol Officer Tyson and Richard William Larsen, driver of a truck.

There is evidence that the concrete pavement was topped with what is called "desert mix." Officer Tyson testified that there was a gouge in the desert mix in the south lane; that the left front tire of the Chevrolet had blown out and that desert mix was found on the rim.

Mr. Larsen testified that he was driving westerly on the highway; that the Chevrolet truck and a second truck driven by a Japanese passed him east of Garnet; that the Chevrolet

preceded the other truck at a distance of from one to two hundred feet and that he followed at about the same distance behind the Japanese truck. Mr. Larsen testified as follows:

"Q. Did you see the System equipment, the semi, before this impact occurred? A. Yes, sir. Q. What part of it could you see, or what did you see? A. I could see the headlights, and the box running lights. Q. After you had completed the curve, Mr. Larsen, and reached a point so that you were going straight, could you then see the headlights and box lights of the System equipment as it approached you? A. Yes, sir. Q. Could you tell, from your position on the highway, where the System truck was, that is, in which lane of traffic it was? A. South lane. . . . Q. I will put it this way: Just before the Japanese truck and the truck involved in the accident reached Garnet, where the Garnet sign is, what did you see them do? A. I saw the tail lights on the truck ahead of the truck immediately ahead of me come out to the left of the truck ahead of me a foot or so. Q. Did that in any way obstruct your view of the approaching System lights that you had theretofore seen? A. Well, yes, they were obstructed at that time. Q. When you saw the tail light of this car, did you see it to one side or the other of the Japanese truck, or where was it? A. To the left side. . . . Q. (Mr. Bauder) Did you see whether or not the car that was in front of the Jap truck was involved in an accident with the System? A. Yes, sir. . . . Q. Did you actually see the vehicles come together? A. No, sir. . . . THE COURT: Do you mean by both that were going in your direction? A. Both of them ahead of me. One was out a little on the other side of the other, which blocked out the other side of the highway and also the approaching lights. Q. (Mr. Bauder) Did you hear any noise? A. Yes, sir. Q. What did you hear? A. I heard the accident. Q. You heard the crash? A. That is right."

At no time did Larsen testify directly that the Chevrolet truck was on its left side of the pavement. He testified he could not see the white line in the center of the pavement. However, in his cross-examination, one counsel in his questions assumed that the witness had so testified and to that extent there might be some testimony construed to that effect.

If we assume that the Chevrolet was driven to the south half of the pavement just before the accident, and that the collision occurred in the south traffic lane in accordance with

the theory of appellant, we can find no error in refusing to give the requested instruction. It is what is called a formu¹ instruction. ■ Such an instruction must contain a correct statement of the law governing the various elements entering into the case. As was said in *Pierce* v. *United Gas & Electric Co.*, 161 Cal. 176 [118 P. 700] :

"It is clear that an instruction directing a verdict for the plaintiff in the event that the jury finds certain facts to be true, must embrace all the things necessary to show the legal liability of the defendant and to warrant the direction or conclusion contained therein that plaintiff is entitled to a verdict, and such is the rule in this state."

■ While it is generally true that violation of a statute is negligence this is not always the case. One important exception comes under the sudden peril rule. ■ Where one is suddenly confronted with an emergency in which his own safety is imperiled, and when such a sudden emergency is created by the unlawful act of another, the failure to act in such a manner as would conserve his own safety does not necessarily establish negligence or contributory negligence in law. (*Cannon* v. *Kemper*, 23 Cal.App.2d 239 [73 P.2d 268] ; *Jolly* v. *Clemens*, 28 Cal.App.2d 55 [82 P.2d 51].) In the last cited case the identical question now before us was considered and it was said:

"We do not think that the legislative narrowing in 1935 by the enactment of section 525 of the Vehicle Code of the statutory exceptions theretofore existing to the obligation normally to drive upon the right half of the roadway, was intended to affect this situation or to apply to the conduct of drivers when suddenly and without fault on their part [they are] confronted by emergencies."

■ While it is usually held that whether a person has been suddenly confronted with imminent peril is a question of fact to be submitted to a jury (*Kehlor* v. *Satterlee*, 37 Cal. App.2d 116 [98 P.2d 759]) still the requested instruction should not have been given without incorporating a proper statement of the law on that subject, as the violation of the law by driving a motor vehicle on the wrong side of the highway may be excused under some circumstances if the jury concludes the sudden peril rule is applicable to the facts before it.

In the instant case the least that can be said is that the

imminent peril rule may be applicable to the facts before us. The jury may well have concluded that Suarez was driving his truck easterly on his own side of the highway at a lawful rate of speed when he saw the heavy vehicle approaching him down a grade at a speed of 60 or more miles an hour and swerving from one side of the road to the other, and that he saw this heavy vehicle swerve towards him. If it be assumed that the jury would have so concluded, as well it might, then certainly it could also have concluded that Suarez was confronted with a sudden and imminent peril that would have excused his violation of the law by driving on his left side of the highway in an attempt to save himself from serious injury if it also be assumed that he did turn to his left side of the highway which is a violent assumption under the evidence before us. As the formula instruction omitted this element there was no error in refusing to give it.

It has also been held that section 525 of the Vehicle Code is applicable to vehicles traveling in the same direction. (*Mathers* v. *County of Riverside*, 22 Cal.2d 781 [141 P.2d 419].)

Further, if we assume without holding that the instruction was proper and should have been given, we cannot reverse the judgment, for a careful study of all the record leaves the conclusion that there has been no miscarriage of justice in this case. (Const., art. VI, § 4½.) The evidence that appellant's vehicle was on its wrong side of the highway when it ran into the Chevrolet seems convincing with very little substantial evidence contradicting it.

For the benefit of the bar in general, as well as counsel for appellant in particular, we wish to call attention to rule 5, and to subdivision ''b'' of rule 10 of Rules on Appeal which places on counsel the burden of proceeding to get the exhibits before the reviewing court. In this court these rules are more honored in their breach than in their observance. The failure of counsel to observe them has caused inconveniences and delays which should have been unnecessary.

The judgments are affirmed.

Barnard, P. J., and Griffin, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied December 4, 1944.